UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | EP-19-CR-00458-DCG-2 |
| | § | |
| FLORENCE AILEEN GONZALEZ, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO SUPPRESS

Presently before the Court is Defendant Florence Aileen Gonzalez's "Motion to Suppress Arrest and Statement of Defendant and Request for Evidentiary Hearing" (ECF No. 72) (hereinafter, "Motion to Suppress"). For the reasons that follow, the Court DENIES the motion.

### I. BACKGROUND

On January 25, 2019, Homeland Security Investigations (HSI) and United States Border Patrol (USBP) agents executed a federal search warrant on a residence at 16205 Metalico Street, Fabens, Texas (the Metalico residence) and found several undocumented aliens (UDAs). Almost simultaneously, nearby at 122 N.W. K Street, Fabens, Texas (the K-Street address), a second group of agents arrested Defendant and her boyfriend Juan Balderas Flores ("Balderas"), who were residents of the Metalico residence. After her arrest, Defendant made incriminating statements during a custodial interview conducted at a USBP station in Clint, Texas.

In February 2019, a federal grand jury sitting in the Western District of Texas, El Paso Division, indicted Defendant for, among others, conspiracy to conceal and harbor illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and (a)(1)(A)(iii).[1] In April 2019, Defendant, through her counsel, filed the instant motion to suppress the statements she made during the

---

[1] Indictment at 1, ECF No. 40.

custodial interview. After the Government filed a response to the motion,[2] the Court held an evidentiary hearing on the motion on June 10, 2019. At the hearing, Eric Lopez (a USBP agent), Lee Rivas (an HSI agent), Juan Vargas (also an HSI agent), and Defendant testified. Following the hearing, the Court ordered the parties to file their proposed findings of fact, citing to the transcript of the hearing, and their proposed conclusions of law.[3] In August 2019, the parties filed a "Joint Proposed Findings of Fact" (ECF No. 113), which contains stipulated facts as well as disputed facts, and their respective "Proposed Conclusions of Law" (ECF Nos. 114, 115).

## II. FINDINGS OF FACT[4]

The Court makes the following findings of fact based on (1) the parties' Joint Proposed Findings of Fact; (2) testimony at the suppression hearing; (3) exhibits introduced at the hearing, including a videotape of Defendant's custodial interview[5]; and (4) the affidavit in support of the application for the federal search warrant (ECF No. 78-1), which Defendant does not contest for purposes of the instant motion.[6] Having observed Lopez, Vargas, Rivas, and Defendant's demeanor and testimony at the hearing, the Court finds the consistent testimony of the agents more credible than Defendant's testimony.

### A. The Events Leading up to January 25, 2019

On November 16, 2018, HSI's Border Enforcement Security Task Force (BEST) received tips on possible alien smuggling activities involving the Metalico residence.

---

[2] Gov't's Resp. to Def.'s Mot. to Suppress [hereinafter Gov't's Resp.], ECF No. 78.

[3] Order, ECF No. 104.

[4] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

[5] Gov't's Hr'g Ex. 4 (on file with the District Clerk's office).

[6] Hr'g Tr. at 90:3–8, ECF No. 101.

Previously, on November 1, 2018, Juan Angel Ramirez ("Angel"), a resident of the Metalico residence, was arrested for transporting two UDAs and admitted to harboring them at that residence. BEST opened an investigation to determine if the residents of the Metalico residence were involved in harboring and transporting UDAs from Ciudad Juarez, Mexico, to El Paso, Texas, and then onto the interior of the United States.

On November 21, 2018, seven UDAs were arrested at a nearby motel in Clint, Texas; they admitted to being harbored at the Metalico residence days earlier. On December 17, 2018, a subject believed to be Angel was observed leaving the residence in a grey 2002 Honda Odyssey at approximately 8:24 p.m.; on the next morning, Angel was arrested near Sweetwater, Texas, while transporting three UDAs in a grey 2002 Honda Odyssey. On January 25, 2019, at approximately 11:05 a.m., BEST agents arrested six UDAs at 214 Fifth Street, Fabens, Texas; two of the UDAs stated that they were harbored at the Metalico residence until 7:00 p.m. on the night before. They further stated that there were six other people left behind at that residence waiting to be picked up, and when a photograph of Angel was shown to them, the UDAs recognized him "as one of the subjects taking care of the people at [the Metalico residence]."

**B. The Events on January 15, 2019**

*1. Surveillance, Detention, and Arrest*

On January 25, 2019, between 5:30 and 6:00 p.m., Andres Maldonado (a supervisory HSI agent), Martha Pedregon (a USBP agent), Lopez, and Rivas, together with other agents, initiated surveillance on the Metalico residence. The agents were in plain clothes and sitting in unmarked cars. While they were surveilling, another agent was preparing an application for the search warrant that was later executed at that residence.

During surveillance, the agents observed, on multiple occasions, a woman and a man—later identified as Defendant and Balderas—leave the Metalico residence in a black Chevy HHR and return to the residence. On the last time they left the residence, the agents followed the HHR. Defendant and Balderas drove, for two to three minutes, to a nearby trailer park and parked the HHR in front of a trailer at the K-Street address, which is approximately 1.3 miles away from the Metalico residence.

Upon arriving at the K-Street address, Defendant and Balderas exited the HHR and were about to enter the trailer, when Maldonado approached them; it was 8:15-8:30 p.m. Maldonado questioned them and sought Balderas's consent to search the Metalico residence, but Balderas declined. Thereafter, Defendant and Balderas went inside the trailer. Maldonado left to join the agents at the Metalico residence to prepare for the search warrant. Lopez, Rivas, another male agent, and two female agents stayed behind at the K-Street address to "keep eyes" on the trailer.

At 8:28 p.m., United States Magistrate Judge Leon Schydlower signed the search warrant applied for by Juan A. Ortiz (an HSI agent). The warrant authorized search of the Metalico residence and seizure therefrom of, *inter alia*, any UDAs in the United States illegally or without proper permission, and indicia of occupancy, residence, or ownership of the residence. Ortiz sought the warrant in connection with HSI's investigation into harboring and transporting aliens by Angel. Ortiz's application for the warrant and affidavit in support thereof did not mention Defendant or Balderas, though the affidavit stated that there was probable cause to believe that Angel was committing conspiracy to harbor aliens in violation of 8 U.S.C. § 1324, and that, according to the UDAs arrested earlier that day at 214 Fifth Street, Fabens, Texas, Angel was "one of the subjects taking care of the people at the [Metalico residence]."

Between 8:45 p.m. and 9:00 p.m., Maldonado called Lopez and informed him that the magistrate judge signed the search warrant and that the agents at the Metalico residence would enter and search the residence. Maldonado further told him not to let Defendant and Balderas leave the K-Street trailer.

A few minutes later, Defendant and Balderas emerged from the trailer and returned to the Chevy HHR. Lopez pulled up his vehicle behind the HHR. Lopez and Rivas approached Balderas, as he was about to enter the HHR, and told him that they were being detained and could not leave because a search warrant was being served at the Metalico residence in search of illegal aliens. Defendant asked if she could sit inside the HHR because it was a cold night, and the agents allowed her to do so. The agents detained Balderas outside the HHR.

Another few minutes later, Maldonado again called Lopez. He told Lopez that the agents at the Metalico residence executed the search warrant and arrested seven UDAs found inside the residence. The agents also found an envelope addressed to Defendant at the Metalico residence and a framed photograph of Defendant and Balderas together—both items were found in the bedrooms of the residence. Maldonado instructed Lopez to place Defendant and Balderas under arrest. A female officer placed Defendant under arrest and handcuffed her, and Rivas *Mirandized* her. Immediately after her arrest, two USBP agents transported Defendant from the K-Street address to the USBP station in Clint, Texas; they left the K-Street address by 9:30 p.m.

In total, twenty to thirty minutes elapsed between the time the agents told Balderas that he and Defendant were being detained and the time the agents placed her under arrest. During this period, the agents did not question her or Balderas; nor did they seize any evidence from Defendant. Balderas asked a couple of times if he was under arrest, and the agents replied that he was detained, but not arrested.

*2. Custodial Interview*

At the USBP station, Vargas and Ortiz interviewed Defendant for approximately seventy minutes: from 11:23 p.m. on January 25 to 12:34 a.m. on January 26, 2019.

At the onset, after eliciting biographical information, the agents read to Defendant her *Miranda* rights and presented her a printed form that contained two sections under the headings (1) "statement of rights" and (2) "waiver." The first section lists the *Miranda* rights, and the second section reads, in part: "I have had the above statement of rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity."[7] The agents explained each section to her, and Defendant signed the form.

Immediately after she signed the form, the following colloquy ensued:[8]

AGENT: Do you have any questions before we start?

DEFENDANT: If, like, I know, I just signed it; but let's just say, you know, I don't wanna talk, say anything, from here, would I be taken to, like, the county or what happens?

AGENT: The way you signed, you are willing to talk to us, so, and I don't know if you understood, one of the rights that had said you can stop the interview at any time.

DEFENDANT: Yeah (nodding in agreement).

AGENT: As far as you going to the county right now, what we'd do is we talk to you, and then, well, we gather all the circumstances that are going on, and then we will introduce it to the United States Attorney's Office, to an AUSA, what they call, an Assistant United States Attorney, and they will make a determination from there.

DEFENDANT: Okay (nodding in agreement).

A minute later, the substantive portion of the interview began.

---

[7] Gov't's Hr'g Ex. 2.

[8] Gov't's Hr'g Ex. 4 at 6:45:23–6:46:29.

During the interview, Defendant stated that she lived with Balderas, his niece, and the niece's two children at the Metalico residence, which is owned by Balderas's mother. Angel, who is the niece's husband or boyfriend, frequently visited the residence and occasionally stayed there.

Defendant described the UDA related activities as follows. Defendant and Balderas had been engaged in these activities for several months. Usually, on each occasion, a group of two to three UDAs were dropped off, they stayed at the Metalico residence for a couple of days, and then they were picked up. Defendant's role was limited to providing care for the UDAs: cooking for them, making sure they ate and showered, and giving them clothes and medicines. Defendant did not know who dropped or picked them up. On each occasion, Balderas received $300 to $500 via MoneyGram. Money was rarely sent to Defendant, with one exception, when $600 was sent to her and she picked it up at a MoneyGram outlet. Defendant did not know how the amount was determined, *i.e.*, how much dollar per UDA. On January 24, 2019, there were nine UDAs at the Metalico residence, and on January 25, the day of her arrest, seven of those UDAs remained there—they were from Guatemala. At one point during the interview, Defendant stated, "I think it's a wake-up call for me; I need to get out of this shit."

## III. CONCLUSIONS OF LAW

By her motion, Defendant claims that her seizure at the K-Street address violated the Fourth Amendment, and this, in turn, "tainted" the voluntariness of the statements she made during the custodial interview. Def.'s Conclusions of Law ¶¶ 5, 7; Mot. to Suppress at 5; Hr'g Tr. at 97:17–98:7. Consequently, she argues, the statements should be suppressed.

"[S]ubject only to a few specifically established and well-delineated exceptions," *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir.2014), the "general rule" is "that Fourth Amendment

seizures are 'reasonable' only if based on probable cause," *Dunaway v. New York*, 442 U.S. 200, 213 (1979). One such exception is the rule announced in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* at 210. Under *Terry*, law enforcement officers may briefly detain—that is, "seize"—a person for investigative purposes if the officers have a "reasonable suspicion" that criminal activity "may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Hill*, 752 F.3d at 1033. Another exception is the rule announced in *Michigan v. Summers*, 452 U.S. 692 (1981). Under *Summers*, officers executing a search warrant on a premises may detain its occupant—without any "particular suspicion that [the occupant] is involved in criminal activity." *Summers*, 452 U.S. at 705; *Bailey v. United States*, 568 U.S. 186, 193 (2013). In *Bailey*, the Supreme Court cabined the spatial bounds of *Summers*'s detention incident to search: it must be "limited to the immediate vicinity of the premises to be searched." *Bailey*, 568 U.S. at 199.

Nevertheless, *Terry* provides an independent basis to detain a recently departed occupant outside *Summers*'s spatial bounds, while a search warrant is being executed at the premises. "Once an individual has left the immediate vicinity of a premises to be searched," the Supreme Court explained, "the lawfulness of detention is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under *Terry* or an arrest based on probable cause." *Bailey*, 568 U.S. at 202; *compare id.* at 201–02 (concluding that *Summers*'s rule was inapplicable to the case because defendant, who was stopped about a mile away, "was detained at a point beyond any reasonable understanding of the immediate vicinity of the premises in question" and remanding the case for the court of appeals to address the district court's "alternative ruling" that the defendant was lawfully stopped under *Terry*), *with United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) [hereinafter *Bailey-on-Remand*] (concluding that evidence procured before handcuffing, but after a valid *Terry* stop, was not the product of an

unlawful detention, but suppressing defendant's statements made after handcuffing because police exceeded the permissible scope of the *Terry* stop).[9]

Turning to the parties' specific arguments, Defendant concedes that at the time she was placed under arrest, the agents had probable cause to arrest her. Joint Proposed Findings of Fact ¶ 17. She argues, however, that her detention at the K-Street address prior to the formal arrest violated *Bailey* because it was done at a location that is not the situs of the execution of the search warrant. Def.'s Proposed Conclusions of Law ¶ 2. The Government, however, justifies the detention under *Terry*: the agents acted lawfully in detaining her outside the K-Street trailer, while other agents executed a lawful search warrant at the Metalico house. Resp. to Mot. to Suppress at 5–6; Gov't's Proposed Conclusions of Law 1–2. Defendant counters that the detention was nonetheless unlawful because it exceeded the permissible scope of a *Terry* stop. *See* Hr'g Tr. at 100:4–6.

As Defendant was detained outside *Summers*'s spatial bounds, the Court analyzes the lawfulness of her detention under *Terry*. Pursuant to *Terry*, the lawfulness of an investigatory stop is tested in two parts: Courts first examine (1) whether the officer's initial action in stopping the defendant was justified, and then determine (2) whether any subsequent action by the officer was reasonably related in scope to the circumstances that justified the stop. *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014) (citing *United States v. Brigham*, 382 F.3d 500, 506–07 (5th Cir. 2004) (en banc)). Below, the Court addresses each part in turn.

---

[9] *Cf. also United States v. Clark*, 647 F. App'x 419, 421–22, 423 n.6 (5th Cir. 2016) (acknowledging that *Bailey* prohibits search warrant from serving as a valid basis for searching the defendant's person and vehicle incident to an arrest because he 'had left the immediate vicinity of a premises to be searched,' and holding that the lawfulness of his arrest was founded on a basis recognized explicitly by *Bailey*—a probable cause arrest).

## A. The First Part: The Initial Stop

The initial stop "is proper when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008) (internal quotes and citations omitted). "Reasonable suspicion requires less information and certainty than the probable cause needed to make an arrest." *Id.* To make a "reasonable suspicion" determination, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing," *United States v. Freeman*, 914 F.3d 337, 348 (5th Cir. 2019), and consider the "information available to the officer[] at the time of the decision to stop a person," *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013). "The facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation, but can also arise from the 'collective knowledge' of law enforcement entities, so long as that knowledge . . . was communicated between those entities at the time of the stop." *Massi*, 761 F.3d at 521.

Here, at the time Lopez and Rivas approached Balderas at the K-Street address (when Balderas was about to enter the HHR, after he and Defendant emerged from the trailer) and told him that they were being detained and could not leave,[10] the following information was available to the agents. For several months, the USBP suspected that the Metalico residence was an alien stash house, and in November 2018, Angel, a resident of the house, admitted to harboring UDAs

---

[10] At this time, Defendant was seized for purposes of the Fourth Amendment. *See Hill*, 752 F.3d at 1033 ("A seizure begins when 'all the circumstances surrounding the incident' are such that 'a reasonable person would have believed that he was not free to leave.'" (quoting *INS v. Delgado*, 466 U.S. 210, 215 (1984)). The earlier, first contact between Maldonado, and Balderas and Defendant—during which Balderas declined to consent to search of the Metalico residence and following which, they went inside the trailer—constituted "mere communication between a citizen and an officer, involving no element of detention or coercion" and therefore, "d[id] not implicate the [F]ourth [A]mendment." *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986).

there. Upon arresting a group of UDAs at another address on the morning of January 25, 2019, the agents learned that (1) the group was harbored at the Metalico residence on the night before, (2) six other UDAs still remained at the residence—on the very day, and (3) individuals, other than Angel, were taking care of them at the residence. The agents observed Defendant and Balderas leave and return to the house several times throughout that day. Given the totality of circumstances, the agents, therefore, had sufficient reasonable suspicion that Defendant was engaged in alien harboring at the Metalico residence in violation of 8 U.S.C. § 1324. Accordingly, the Court concludes that the initial stop for investigative purposes was justified under *Terry*.

**B. The Second Part: Scope of the Detention**

Though the agents had reasonable suspicion to stop Defendant, the agents' subsequent "actions must not exceed the permissible scope of the stop." *Vickers*, 540 F.3d at 361–62. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In assessing whether the detention is too long to be justified as an investigative stop, "[t]he question is whether the [officers] 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Vickers*, 540 F.3d at 362 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). The Fifth Circuit's caselaw requires "both the scope and length of the officer's investigation to be reasonable in light of the facts articulated as having created the reasonable suspicion of criminal activity." *Massi*, 761 F.3d at 521–22; *see also Brigham*, 382 F.3d at 507 ("The correct analysis requires district courts . . . to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances.").

Defendant argues that the Government cannot support continued detention because the agents did not question Defendant or Balderas, or search the two. Def.'s Conclusions of Law ¶ 3; Hr'g Tr. at 94:16–20. But, "[i]n the course of *Terry* stops, [law enforcement officers] routinely employ a range of investigative techniques not limited to detainee questioning and not requiring detainee participation." *Bailey-on-Remand*, 743 F.3d at 338 (collecting cases); *see also United States v. Place*, 462 U.S. 696, 706 (1983) (upholding seizure of luggage to conduct dog sniff, "provided that the investigative detention is properly limited in scope"); *Brigham*, 382 F.3d at 511 ("Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto.").

Here, Defendant was detained for twenty to thirty minutes—until she was formally placed under arrest. During that period, the agents permitted her to sit in her own car without handcuffs and diligently used "a readily available investigative means—execution of an already-procured search warrant at the suspected crime scene—to confirm or dispel suspicion of [Defendant's] ongoing criminal activity." *Bailey-on-Remand*, 743 F.3d at 337; *see also id.* at 338 ("[W]e hold that a defendant reasonably suspected of criminal activity at particular premises may be detained briefly pursuant to *Terry* while police lawfully search the premises to confirm or dispel that suspicion."). The execution of the warrant and detention commenced within minutes of each other. Once the search found seven UDAs in the residence confirming the agents' suspicion, the agents placed Defendant under arrest. Immediately after her arrest, she was transported to the USPB station. Nothing suggests that the agents unnecessarily prolonged the search or acted less than diligently.

The Court concludes that Defendant's detention, while the agents executed the search warrant at the Metalico residence, was reasonable and justified under the circumstances, *see United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011) (holding *Terry* detention lasting thirty to forty minutes was reasonable, while a search warrant was being executed at a residence), and did not, contrary to Defendant's claim, morph into a *de facto* arrest, *cf. Massi*, 761 F.3d at 521–24 (holding, for about an hour after the initial stop, investigatory detention continued to be justified under *Terry* and therefore, did not morph into a *de facto* arrest, though thereafter, defendant was under arrest because justification under *Terry* to hold him had ended).

In sum, the Court concludes that Defendant's detention was lawful under *Terry*. As Defendant's sole basis for her motion to suppress is that her detention was unlawful, the Court denies her request to suppress the statements.

## IV. CONCLUSION

For the foregoing reasons, Defendant Florence Aileen Gonzalez's "Motion to Suppress Arrest and Statement of Defendant and Request for Evidentiary Hearing" (ECF No. 72) is **DENIED**.

So ORDERED and SIGNED this 12th day of September 2019.

DAVID C. GUADERRAMA
**UNITED STATES DISTRICT JUDGE**